# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

FRANKIE M. HODGES,       )
                             )
       Plaintiff,        )
                             )
    vs.                   )     Case No. 4:12CV1134 LMB
                             )
CAROLYN W. COLVIN,[1]       )
Acting Commissioner of Social Security,  )
                             )
       Defendant.      )

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Frankie M. Hodges for Disability Insurance Benefits under Title II of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. <u>See</u> 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. (Doc. No. 17). Defendant filed a Brief in Support of the Answer. (Doc. No. 20).

## Procedural History

On July 16, 2009, plaintiff filed her application for Disability Insurance Benefits, claiming that she became unable to work due to her disabling condition on July 22, 2008. (Tr. 161-67). This claim was denied initially and, following an administrative hearing, plaintiff's claim was

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

denied in a written opinion by an Administrative Law Judge (ALJ), dated May 20, 2011.  (Tr. 81-85, 65-76).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on April 26, 2012.  (Tr. 5, 1-4).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## **Evidence Before the ALJ**

### A. **ALJ Hearing**

Plaintiff's administrative hearing was held on October 13, 2010.  (Tr. 8).  Plaintiff was present and was represented by counsel.  (Id.).  Also present was vocational expert Robin A. Cook.  (Id.).

Plaintiff's attorney stated that plaintiff was waiting to receive records from her chiropractor.  (Tr. 10).  The ALJ indicated that he would leave the record open for thirty days.  (Id.).

The ALJ examined plaintiff, who testified that she was forty-five years of age, and had a twelfth grade education.  (Tr. 11).  Plaintiff stated that she attended one or two semesters of community college but did not earn a degree.  (Tr. 12).  Plaintiff testified that she was five-feet, five-inches tall, and weighed 240 pounds.  (Id.).  Plaintiff stated that she was able to read, write, and perform basic mathematics.  (Tr. 13).

Plaintiff testified that she served in the Air Force for six years and eleven months.  (Id.).  Plaintiff stated that she was a cook in the Air Force.  (Id.).

Plaintiff testified that she received a monthly pension in the amount of $2,400.00 at the time of the hearing.  (Tr. 14).

Plaintiff stated that she lived in a house with her twelve-year-old daughter. (Id.).

Plaintiff stated that she had filed a workers' compensation claim and had not yet received a settlement. (Id.). Plaintiff testified that she had private health insurance through her former employer. (Id.).

Plaintiff stated that she last worked in July of 2008 for Chrysler Corporation. (Tr. 15). Plaintiff testified that she worked for Chrysler for thirteen years. (Id.). Plaintiff stated that she worked a "rolls" job at Chrysler, which involved testing vehicles when they were on rollers and connected to a computer. (Id.). Plaintiff testified that she also performed a "hosteel" position, which involved connecting a computer box to vehicles. (Tr. 16). Plaintiff described this position as vehicle inspection. (Id.).

Plaintiff testified that she worked as a sorter at a factory, which involved sorting inner tubes that weighed a total of twenty-five to fifty pounds. (Id.).

Plaintiff stated that she has worked as a dietary aide at a hospital. (Tr. 18). Plaintiff testified that she took trays to patients' rooms and then washed trays at this position. (Id.).

The ALJ noted that plaintiff was using a cane when she walked into the hearing room, and that she had braces on her right and left knee. (Tr. 20). Plaintiff testified that Dr. Mark Miller prescribed the cane. (Id.). Plaintiff stated that she had undergone two surgeries on her left knee, and she needs a total knee replacement. (Id.). Plaintiff testified that her doctor recommended delaying the total knee replacement until she was older to avoid a repeat procedure. (Id.).

Plaintiff testified that she had not undergone surgery on her right knee, but it was beginning to grind and was painful. (Tr. 21). Plaintiff stated that her doctors did not prescribe the braces, although they recommended them. (Id.). Plaintiff testified that she had been wearing

the left knee brace for approximately a year-and-a-half, and the right knee brace for six to eight months. (Tr. 21-22).

Plaintiff testified that she also experienced lower back pain. (Tr. 22). Plaintiff stated that she had never undergone back surgery, but she had undergone injections. (Id.). Plaintiff testified that Dr. Lukasz Curylo has recommended back surgery, but surgery has not been scheduled. (Tr. 23).

Plaintiff stated that she last underwent surgery on her left knee in 2008. (Tr. 24). Plaintiff testified that Dr. Miller performed the surgery. (Id.).

Plaintiff stated that she had begun to experience pain in her shoulders from using her cane. (Tr. 25). Plaintiff testified that she also occasionally experiences chest pain from being off center. (Id.). Plaintiff stated that she has reported these complaints to her primary care doctor, Dr. Galileu Cabral. (Id.).

Plaintiff testified that she lives in a tri-level home. (Id.). Plaintiff stated that her washer and dryer are on the lower level of her home. (Tr. 26). Plaintiff testified that she has to climb four to five steps to get from one level to the next. (Id.).

Plaintiff stated that her daughter is not involved in any activities at school. (Id.). Plaintiff testified that her daughter rides the bus to and from school. (Id.).

Plaintiff stated that she recently went on vacation to Branson with her parents. (Id.). Plaintiff testified that she attended a show in Branson. (Tr. 27).

Plaintiff stated that she does not cook often, and usually just uses the microwave to prepare meals. (Tr. 27). Plaintiff testified that she is teaching her daughter how to cook. (Id.). Plaintiff stated that her daughter washes dishes, does the laundry, and vacuums. (Id.). Plaintiff

testified that she hires someone to do her yard work.  (Id.).

Plaintiff testified that she was taking Vicodin,[2] Celebrex,[3] and Lexapro[4] at the time of the hearing.  (Id.).  Plaintiff stated that she experiences drowsiness, constipation, and irritability from her medications.  (Tr. 28).

Plaintiff testified that she has a car, and that she occasionally drives.  (Id.).  Plaintiff stated that someone is usually with her when she shops for groceries, and that she does not carry the packages inside her home.  (Tr. 29).  Plaintiff testified that she shops for school clothes with her daughter at Wal-Mart.  (Id.).

Plaintiff testified that she is able to walk about five to seven minutes before she has to rest.  (Id.).  Plaintiff stated that she can stand for about ten minutes.  (Id.).  Plaintiff testified that she changes positions frequently when sitting due to pain.  (Id.).  Plaintiff stated that she is able to sit for ten to twenty minutes.  (Id.).  Plaintiff testified that she can lift five to ten pounds.  (Id.).

Plaintiff's attorney examined plaintiff, who testified that she experiences back pain and shoulder pain when she lifts a gallon of milk.  (Tr. 30).

Plaintiff stated that she sits in a chair in her shower and her daughter helps her get out of the shower.  (Id.).  Plaintiff testified that her daughter helps her dress, and that her daughter puts on her socks and shoes.  (Tr. 31).  Plaintiff stated that she is unable to bend, kneel, or squat.  (Id.).

---

[2]Vicodin is a narcotic analgesic indicated for the relief of moderate to moderately severe pain.  See Physician's Desk Reference ("PDR"), 532 (63rd Ed. 2009).

[3]Celebrex is indicated for the treatment of osteoarthritis.  See PDR at 2981.

[4]Lexapro is an antidepressant indicated for the treatment of major depressive disorder and generalized anxiety disorder.  See PDR at 1174-75.

Plaintiff testified that she has difficulty sleeping, and that she is up most of the night. (Id.). Plaintiff stated that she usually sleeps three to four hours a night. (Id.). Plaintiff testified that she does not nap during the day. (Id.).

Plaintiff stated that she had recently gained about ten pound due to immobility. (Id.).

Plaintiff testified that she was injured at work. (Tr. 32). Plaintiff stated that she lost her footing when walking on an uneven grate during a vehicle inspection and twisted her knee. (Id.). Plaintiff stated that her knee started to swell instantly and it never completely stopped swelling. (Id.). Plaintiff testified that this injury caused her to stop working. (Id.). Plaintiff stated that her doctor took her off work after her injury. (Id.). Plaintiff testified that her right knee also occasionally swells. (Tr. 33).

Plaintiff stated that she applies ice and heat to her knee to help relieve the pain. (Id.). Plaintiff testified that she also does exercises, and takes medication. (Id.).

Plaintiff stated that she occasionally experiences numbness or tingling in her feet. (Id.). Plaintiff testified that she has pain in her back from her waist down through her leg. (Id.). Plaintiff stated that she occasionally experiences a stabbing or shooting pain, especially when walking. (Id.).

Plaintiff testified that she spends most of her days just massaging her knee. (Id.). Plaintiff stated that her daughter does all of the household chores. (Id.). Plaintiff testified that her daughter is not able to do everything, so her house is not as clean as it used to be. (Id.).

Plaintiff stated that she avoids driving because she is unable to sit down for long periods. (Tr. 34).

Plaintiff testified that the injections she received did not provide any lasting pain relief.

(Id.).  Plaintiff stated that her pain increases in cold weather.  (Id.).  Plaintiff testified that her pain is all over: in her knees, hips, back, shoulder, and neck.  (Id.).

Plaintiff stated that Dr. Miller imposed numerous limitations, including lifting no more than five to ten pounds.  (Tr. 35).

Plaintiff testified that she sometimes stays in bed all day due to depression and pain.  (Id.). Plaintiff stated that her primary care physician and counselor prescribed medication for her depression.  (Tr. 36).  Plaintiff testified that she has been seeing a counselor every two weeks for three to four months.  (Id.).

Plaintiff stated that other than going to doctor appointments, she attends church about once a month, and visits her parents about once a week.  (Tr. 37).  Plaintiff testified that she visits her mother at her place of employment, which is about twenty minutes away from plaintiff's home.  (Id.).  Plaintiff stated that she does not attend church every week due to her pain.  (Tr. 38).

Plaintiff testified that she went on vacation with her parents in August of 2010.  (Id.). Plaintiff stated that she was unable to participate in some activities with her parents, such as walking by the water.  (Id.).

The ALJ re-examined plaintiff, who testified that she was taking Lexapro for depression. (Id.).  Plaintiff stated that she started seeing a counselor because she was not acting like herself. (Tr. 39).  Plaintiff testified that she used to be laid-back and she started overreacting and yelling. (Id.).  Plaintiff stated that she only sees a counselor and does not see a psychiatrist.  (Id.). Plaintiff testified that her primary care physician prescribes her psychiatric medication.  (Id.).

The ALJ next examined vocational expert Robin Cook, who testified that plaintiff's past

work is classified as follows: finish inspector (light, unskilled); dietary aide (medium, unskilled); and tube sorter (light, semi-skilled).  (Tr. 42-43).

The ALJ asked Ms. Cook to assume a hypothetical individual with plaintiff's background and the following limitations: sedentary work; occasionally climb stairs and ramps; never climb ropes, ladders, and scaffolds; occasionally stoop, kneel, and crouch; never crawl; and must avoid concentrated exposure to extreme cold and wetness.  (Tr. 43-44).  Ms. Cook testified that the individual would be unable to perform plaintiff's past work, but would be able to perform other sedentary work, such as: charge account clerk (224,690 positions nationally, 5,810 in Missouri); and call out operator (65,020 positions nationally, 870 in Missouri).  (Tr. 44).

The ALJ next asked Ms. Cook to add a limitation of a sit-stand option, with the ability to change positions every thirty minutes, to the previous hypothetical.  (Tr. 45).  Ms. Cook testified that the jobs she mentioned would not be available.  (Id.).  Ms. Cook stated that the individual would be able to perform other work, such as: document preparer, microfilm (31,040 nationally, 830 in Missouri); and final assembler, optical (280,160 nationally, 1,890 in Missouri).  (Tr. 45-46).

The ALJ then asked Ms. Cook to assume the individual would need to change positions at will.  (Id.).  Ms. Cook testified that this limitation would preclude the jobs she cited, and all other work in the national economy.  (Id.).

Plaintiff's attorney next examined Ms. Cook.  Ms. Cook testified that there would be no work available if a hypothetical individual were limited to no squatting, stooping, crouching, or crawling.  (Tr. 47).

The ALJ asked Ms. Cook to assume the individual cannot crouch or kneel, but could

stoop occasionally.  (Id.).  Ms. Cook testified that the sedentary jobs she previously mentioned would be available.  (Tr. 48).

The ALJ indicated that he would order a consultative orthopedic evaluation.  (Tr. 48-49).

**B.    Relevant Medical Records**

Plaintiff presented to orthopedist Mark D. Miller, M.D., on July 14, 2008, with complaints of a left knee injury.  (Tr. 259-60).  Plaintiff reported that she originally injured her left knee at work in 2000, and underwent an ACL reconstruction.  (Tr. 259).  Plaintiff indicated that she reinjured her knee at work on July 2, 2008, when she caught her foot on an uneven section of a grate.  (Id.).  Dr. Miller ordered an MRI.  (Tr. 260).

On July 23, 2008, Dr. Miller indicated that plaintiff had undergone an MRI on July 16, 2008, which revealed the following findings: advanced degenerative joint disease[5] of the medial compartment with full thickness in the weight bearing surface of the medial femoral condyle and medial tibial plateau, medial meniscal extrusion form the joint, periarticular spurring, medial meniscus maceration and degenerative tearing, and mild lateral tibial subluxation relative to the distal femur.  (Tr. 257).  Dr. Miller stated that plaintiff's injury exacerbated and irritated a pre-existing arthritic knee that was the result of an original work injury in 2000.  (Tr. 258).  Dr. Miller recommended conservative treatment consisting of rest, physical therapy, and out of work until she is able to weight bear.  (Id.).  Dr. Miller administered a steroid injection.  (Id.).  On August 14, 2008, plaintiff reported that the cortisone injection did not provide any relief.  (Tr. 255).

_____

[5]Degenerative joint disease, or osteoarthritis, is arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result; mainly affects weight-bearing joints.  Stedman's Medical Dictionary, 1388 (28th Ed. 2006).

Plaintiff used crutches and was having difficulty walking. (Id.). On September 11, 2008, Dr. Miller indicated that plaintiff was unable to weight bear, and was unable to tolerate physical therapy. (Tr. 253). Dr. Miller recommended a diagnostic arthroscopy.[6] (Id.).

Plaintiff underwent left knee arthroscopy on September 19, 2008, which revealed a fairly large medial meniscal[7] tear. (Tr. 272). Dr. Miller performed a partial medial meniscectomy[8] and chondroplasty.[9] (Tr. 273).

Plaintiff saw Dr. Miller for a three month post-operative visit on December 2, 2008, at which time Dr. Miller stated that plaintiff's recovery had been quite slow and plaintiff had struggled with progression of weight-bearing and range of motion. (Tr. 249). Plaintiff was still using a cane for ambulatory assistance. (Id.). Dr. Miller recommended that plaintiff continue to be off work. (Id.). Dr. Miller indicated that plaintiff went to work the previous day to see the physician for her restrictions, and fell when her left knee buckled and gave out. (Id.). Plaintiff hurt her knee, hip, back, neck, and shoulders. (Id.). Plaintiff was given an out-of-work slip until March. (Id.). Dr. Miller stated that plaintiff had clearly re-irritated her left arthritic knee and recommended physical therapy. (Tr. 250). On January 5, 2009, plaintiff reported that her knee has "good days and bad days." (Tr. 247). Plaintiff indicated that her knee was doing a little better and she had made progress with physical therapy, although her knee still wants to buckle and give out. (Id.). Plaintiff was using a crutch for ambulatory assistance. (Id.). Upon

---

[6]Endoscopic examination of the interior of a joint. See Stedman's at 162.

[7]The meniscus is a crescentic fibrocartilaginous structure of the knee. Stedman's at 1184.

[8]Excision of a meniscus from the knee joint. See Stedman's at 1184.

[9]Reparative surgery of cartilage. Stedman's at 369.

examination, Dr. Miller noted trace effusion;[10] range of motion of ten to ninety-five degrees; and

plaintiff was able to do a straight-leg raise.  (Id.).  Dr. Miller stated that plaintiff was recovering

from her recent fall, but was left with the arthritic nature of her knee.  (Id.).  Dr. Miller

recommended another month of physical therapy to try to restore maximal function.  (Tr. 248).

On February 4, 2009, Dr. Miller indicated that plaintiff had been in physical therapy and was using

a cane.  (Tr. 245).  Plaintiff continued to complain of catching in her knee.  (Id.).  Upon

examination, Dr. Miller noted no effusion; range of motion was zero to seventy-five degrees; and

plaintiff was very mechanical with her movements related in part to knee pain as well as low back

pain.  (Id.).  Dr. Miller stated that plaintiff's knee has not responded to surgery.  (Id.).  Dr. Miller

found that plaintiff was unable to return to her past work but she may do sit down work, clerical

type of activities with minimal walking, and minimal lifting.  (Id.).  Dr. Miller stated that, at some

point, plaintiff will need a total knee replacement.  (Tr. 246).

Plaintiff presented to orthopedist Matthew Gornet, M.D. on February 9, 2009, for an

initial spine examination.  (Tr. 333-34).  Plaintiff complained of low back pain to the left buttock

and left hip, down the left leg to the foot, with numbness in the left foot.  (Tr. 333).  Plaintiff

reported that her pain began in December of 2008, when her knee gave out at work.  (Id.).  Upon

examination, plaintiff had full motor strength in all groups, some mild weakness in plantar flexion

on the left at 4/5; some giving away; decreased sensation at S1 on the left; range of motion of the

hips was not productive for pain; straight leg raise was productive for low back pain and left

buttock and left leg pain at about forty-five degrees; and normal gait.  (Tr. 333-34).  Dr. Gornet

---

[10]The escape of fluid from the blood vessels or lymphatics into the tissues or a cavity. Stedman's at 616.

recommended an MRI. (Tr. 334). On March 30, 2009, plaintiff saw Dr. Gornet for follow-up, at which time Dr. Gornet indicated that plaintiff's MRI scan clearly revealed severe bilateral facet arthropathy[11] at L5-S1. (Tr. 332). Dr. Gornet recommended epidural steroid injections, and possibly a CT myelogram.[12] (Id.).

On March 2, 2009, Dr. Miller noted that plaintiff had been fitted for a brace, and was wearing the brace. (Tr. 244). Upon examination, plaintiff was using a cane; no effusion was noted; and plaintiff's range of motion was ten to eighty degrees. (Id.). Dr. Miller stated that plaintiff's knee has end-stage medial compartment degenerative joint disease, with basically no meniscus there plus eburnated[13] bone. (Id.). Dr. Miller stated that plaintiff "is functional but not much more than clerical/sedentary activities." (Id.).

Plaintiff presented to Lukasz J. Curylo, M.D. on May 7, 2009, with complaints of back pain that was worse with standing, walking, and bending and was somewhat relieved by sitting. (Tr. 328). Plaintiff had received chiropractic treatments for her back pain. (Id.). Upon examination, plaintiff had an antalgic gait due to left knee pain; she ambulated with a cane; she had pain with lumbar flexion at the left of the knees and pain with lumbar extension; she had slightly decreased strength in the left quadriceps due to pain inhibition and tenderness at the knee; decreased sensation in the L5 distribution on the left; straight leg raising on the left at ninety degrees recreated back pain; limited range of motion of the left knee; and slight knee effusion.

---

[11]Deterioration of the facet joints. See Stedman's at 161.

[12]Radiographic contrast study of the spinal subarachnoid space and its contents. Stedman's at 1269.

[13]A change in exposed subchondral bone in degenerative joint disease in which it is converted into a dense substance with a smooth surface like ivory. Stedman's at 607.

(Tr. 329).  Dr. Curylo indicated that a March 2009 MRI of the lumbar spine revealed L5-S1 spondylolisthesis.[14]  (Id.).  Dr. Curylo recommended conservative therapy, consisting of Medrol Dosepak,[15] physical therapy, and chiropractic treatments with Dr. Nasrallah.  (Id.).

Plaintiff presented to Dr. Miller on May 12, 2009, at which time plaintiff was still using a cane for ambulatory assistance and struggled somewhat getting up onto the exam table; plaintiff had 1+ effusion; and her range of motion was ten to ninety degrees.  (Tr. 242).  Dr. Miller stated that plaintiff's knee status was unchanged and her restrictions were the same.  (Tr. 243).  Dr. Miller stated that plaintiff could sit primarily; should not do prolonged standing, or walking much more than two to four hours per day; should use her cane and brace at all times; and should not lift much more than ten to twenty pounds.  (Id.).  Dr. Miller again stated that plaintiff will ultimately require knee replacement.  (Id.).

Plaintiff saw Dr. Curylo for follow-up on June 15, 2009, at which time plaintiff reported that her symptoms were still severe in both lower extremities, with pain radiating down to the foot.  (Tr. 237).  Upon examination, plaintiff had an antalgic gait partially because of her osteoarthritis of the left knee, and she ambulated with a cane.  (Id.).  Plaintiff's exam was otherwise unchanged.  (Id.).  Dr. Curylo diagnosed plaintiff with Grade I L5-S1 spondylolisthesis

---

[14]Forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or on the sacrum.  Stedman's at 1813.

[15]Medrol is a steroid indicated for the treatment of arthritis.  See WebMD, http://www.webmd.com/drugs (last visited September 9, 2013).

with severe lumbago[16] and sciatica,[17] refractory to conservative care for six months. (Id.). Dr. Curylo discussed the option of surgery with plaintiff, and plaintiff indicated that she was unsure how she wished to proceed. (Id.).

On June 25, 2009, Dr. Miller completed a "Work Status Report," in which he indicated that plaintiff may return to regular duty with the following restrictions: sedentary work (maximum lifting limit of ten pounds occasionally); no standing or walking more than one to two hours a day; frequent position changes; and plaintiff should wear her brace and use her cane. (Tr. 263).

Plaintiff underwent a CT scan of the lumbar spine with lumbar myelogram on June 30, 2009, which revealed L4-L5 prominent facet osteoarthritis with mild foraminal narrowing. (Tr. 234). Plaintiff saw Dr. Curylo on August 24, 2009, at which time plaintiff reported she continued to have severe back and leg pain. (Tr. 330). Upon examination plaintiff had an antalgic gait, positive straight leg raise on the left, and had pain with lumbar extension. (Id.). Dr. Curylo diagnosed plaintiff with spondylolisthesis, L5-S1, Grade I; and severe degenerative joint disease of the facets at that level. (Id.). Plaintiff was unsure whether she wanted to proceed with surgery. (Id.).

Plaintiff presented to Dr. Miller on July 9, 2009, at which time Dr. Miller noted 1 to 2+ effusion; and range of motion of fifteen to ninety degrees. (Tr. 240). Plaintiff's restrictions remained unchanged. (Id.). Dr. Miller stated that plaintiff was "unfortunately very young" to

---

[16]Pain in mid and lower back. Stedman's at 1121.

[17]Pain in the lower back and hip radiating down the back of the thigh into the leg, initially attributed to sciatic nerve dysfunction but now known to usually be due to a herniated lumbar disc compressing a nerve root, most commonly the L5 or S1 root. Stedman's at 1731.

undergo knee replacement due to the lifespan of a knee replacement. (Id.).

Galileu Cabral, M.D., completed a medical source statement on July 28, 2009, in which he stated that plaintiff had severe pain and tenderness of her lower back and left knee and an abnormal gait. (Tr. 286). Plaintiff wore a brace on her left knee and used a cane. (Id.). Dr. Cabral stated that plaintiff had lower back tenderness with bilateral straight leg raising test. (Id.).

On January 25, 2010, Daniel G. Sohn, M.D., administered lumbar epidural steroid injections. (Tr. 338). On March 1, 2010, plaintiff reported that the injections provided no improvement (Tr. 388). Plaintiff continued to report severe pain across her low back, which radiates down her left posterior thigh to the ankle. (Id.). Upon examination, plaintiff's stance and gait were slow and stiff and performed with a cane. (Id.). Plaintiff had tenderness to palpation in her left lumbar paraspinal. (Id.). Dr. Sohn diagnosed plaintiff with low back pain, sciatica, L5-S1 spondylolisthsis, and stenosis;[18] and severe left knee pain. (Id.). Dr. Sohn prescribed Vicodin and referred plaintiff to Dr. Curylo to discuss surgical intervention. (Tr. 389).        In a letter dated September 20, 2010, Frances J. Thomas, LCSW, indicated that he had been seeing plaintiff for counseling biweekly since July 9, 2010, for diagnoses of anxiety disorder NOS; and phase of life identity crisis; with a GAF score of 65.[19] (Tr. 383-84). Mr. Thomas stated that plaintiff was in obvious physical and emotional distress, her affect was sad, and her expressions were halting and circumstantial. (Tr. 384). Plaintiff had been experiencing an identity crisis since her work-

---

[18]Narrowing of the spinal canal. See Stedman's at 1832.

[19]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." See Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

related injury in 2008. (Id.). The prolonged financial insecurity of being unable to work, but not approved for disability created mounting anxiety and depressive mood swings diminishing plaintiff's coping and problem-solving capacities. (Id.). Plaintiff's concentration, communication, and ability to focus and plan have been impacted by the major disruption in plaintiff's life as she knew it. (Id.). Plaintiff was responding to directive psycho-therapy focusing on increasing her coping capacity to deal with chronic pain and a disability identity. (Id.).

Dr. Cabral completed a Physical Residual Functional Capacity Questionnaire on October 23, 2010, in which he indicated that he had been treating plaintiff approximately monthly since July 2008 for diagnoses of anxiety, myalgias, and osteoarthritis of the knees and back. (Tr. 410). Plaintiff's symptoms were painful knees and back, and difficulty walking with a cane. (Id.). Dr. Cabral stated that plaintiff was unable to work due to difficulty in mobility and moving objects. (Id.). Dr. Cabral found that plaintiff's experience of pain would interfere with attention and concentration needed to perform even simple work tasks constantly; she was incapable of even "low stress" jobs; she could sit or stand for ten minutes at one time; sit or stand a total of two hours in an eight -hour work day; must use a cane and brace when standing or walking; can rarely lift less than ten pounds and can never lift more than ten pounds; can rarely twist or climb stairs; and can never stoop, crouch, or climb ladders. (Tr. 413).

On October 25, 2010, Nadim Nasarallah, M.S.D.C. completed a Physical Medical Source Statement, in which he listed plaintiff's diagnoses as: left knee torn meniscus and advanced degenerative joint disease; right knee meniscus tear; lumbar disc syndrome L4-L5 with sciatica; right shoulder AC joint dysfunction and rotator cuff syndrome; depression/anxiety disorder; and

fibromyalgia.[20] (Tr. 423). Dr. Nasarallah expressed the opinion that plaintiff was capable of sitting for a total of one hour, standing a total of thirty minutes, walking a total of fifteen minutes, lifting and carrying five pounds occasionally, had a significant manipulative limitation of the ability to handle with both hands, was limited in her ability to balance, could never reach or stoop, could never be exposed to odors or dust, could occasionally be exposed to noise, should use a cane and brace, should lie down during a normal workday, and would need to take a break every ten to fifteen minutes. (Tr. 423-26).

On October 26, 2010, Dr. Miller completed a Physical Residual Functional Capacity Questionnaire, in which he indicated that plaintiff's diagnoses were left knee degenerative disc disease and ACL tear. (Tr. 427). Dr. Miller listed plaintiff's symptoms as knee pain, swelling, antalgic gait, and inability to stand or walk for prolonged periods; with objective findings of knee effusion and limited range of motion. (Id.). Dr. Miller indicated that plaintiff's experience of pain or other symptoms would frequently interfere with attention and concentration needed to perform even simple work tasks. (Tr. 428). Dr. Miller found that plaintiff was capable of low stress jobs, and that she could perform "sit down work without stressing lower extremity." (Id.). Dr. Miller expressed the opinion that plaintiff could walk two city blocks; sit continuously for more than two hours; stand continuously for one hour; stand or walk a total of less than two hours in an eight-hour workday; sit at least six hours in an eight-hour workday; must walk around every sixty minutes for five minutes; requires a job that permits shifting positions at will; would likely need to

---

[20]A common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution. Additionally, point tenderness must be found in at least 11 of 18 specified sites. Stedman's at 570.

take an unscheduled break one to two times during the workday for about ten minutes; must use a cane; can occasionally lift and carry less than ten pounds and can rarely lift ten to twenty pounds; can rarely twist, stoop, and climb stairs; and can never crouch/squat or climb ladders. (Tr. 428-30). Dr. Miller indicated that plaintiff would likely be absent from work as a result of her impairments or treatment about two days a month. (Tr. 430). Dr. Miller stated that plaintiff required total knee replacement due to osteoarthritis, and that she experiences pain at rest and activity. (Tr. 431). Dr. Miller stated that plaintiff is unable to perform prolonged walking or standing. (Id.).

Plaintiff presented to Alan Morris, M.D. on November 11, 2010, for a consultative orthopedic evaluation. (Tr. 434-36). Plaintiff reported that she was not under the care of a doctor regarding her left knee, having been told to return when the pain was so bad she needed a knee replacement. (Tr. 434). Plaintiff complained of swelling in both knees, and pain in her left knee. (Id.). Plaintiff wore braces on both knees. (Id.). Plaintiff reported low back pain, which worsened after a fall secondary to her knees in November 2009. (Tr. 435). Upon examination, plaintiff was able to walk fifty feet slowly, stopping after twenty-five feet; she used a cane in her right hand; walked bent forward thirty degrees at her spine and stood thirty degrees forward flexed; she cannot heel walk, toe walk or do a tandem gait nor squat; cannot dress nor undress independently; can rise from a chair by using a cane in he right hand and pushing up with her left; and cannot get on or off the examining table. (Tr. 435). Plaintiff's right knee demonstrated no joint effusion with 120 degrees of flexion and full extension; she had global tenderness to light touch; her left knee lacked thirty degrees of extension, and flexed to sixty degrees with global tenderness. (Id.). Dr. Morris diagnosed plaintiff with left knee pain with degenerative joint

disease; right knee arthralgia; and low back pain with L4/5 facet arthrosis.  (Tr. 435-36).

Dr. Morris completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical), in which he expressed the opinion that plaintiff could occasionally and frequently lift or carry less than ten pounds; stand or walk less than two hours in an eight-hour workday and that a medically required hand-held assistive device is necessary for ambulation; must periodically alternate between sitting and standing to relieve pain; her ability to push and pull is limited; and can never climb, balance, kneel, crouch, crawl, or stoop.  (Tr. 437-38).

## The ALJ's Determination

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has not engaged in substantial gainful activity since July 22, 2008, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*).

3. The claimant has the following severe impairments: bilateral degenerative joint disease of the knees, obesity, and lumbar degenerative disc disease with facet osteoarthritis (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry up to 10 pounds, stand or walk two hours out of an eight-hour work day, and sit six hours out of an eight-hour work day.  The claimant must have a sit-stand option with the ability to change positions frequently (every 30 minutes).  The claimant can occasionally climb stairs and ramps and can occasionally stoop.  The claimant can never kneel, crouch, or crawl, and the claimant must avoid concentrated exposure to extreme cold and wetness.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on June 17, 1965 and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 22, 2008 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 67-75).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on July 8, 2009, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

(Tr. 76).

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

## B.      Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a

medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.   Plaintiff's Claim

Plaintiff argues that the ALJ erred in determining plaintiff's RFC.

The ALJ made the following determination with regard to plaintiff's RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry up to 10 pounds, stand or walk two hours out of an eight-hour work day, and sit six hours out of an eight-hour work day. The claimant must have a sit-stand option with the ability to change positions frequently (every 30 minutes). The claimant can occasionally climb stairs and ramps and can occasionally stoop. The claimant can never kneel, crouch, or crawl, and the claimant must avoid concentrated exposure to extreme cold and wetness.

(Tr. 68).

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

Plaintiff contends that the RFC formulated by the ALJ is inconsistent with the medical opinion evidence. Specifically, plaintiff argues that the ALJ did not explain why he rejected parts of Dr. Miller's opinion. Plaintiff also contends that the RFC did not take into account plaintiff's spinal impairments or her obesity.

Dr. Miller completed a Physical Residual Functional Capacity Questionnaire on October

26, 2010, in which he expressed the opinion that plaintiff could sit continuously for more than two

hours; stand continuously for one hour; stand or walk a total of less than two hours in an eight-

hour workday; sit at least six hours in an eight-hour workday; must walk around every sixty

minutes for five minutes; requires a job that permits shifting positions at will; would likely need to

take an unscheduled break one to two times during the workday for about ten minutes; must use a

cane; can occasionally lift and carry less than ten pounds and can rarely lift ten to twenty pounds;

can rarely twist, stoop, and climb stairs; and can never crouch/squat or climb ladders. (Tr. 428-

30). Dr. Miller stated that plaintiff could perform "sit down work without stressing lower

extremity." (Tr. 428). Dr. Miller indicated that plaintiff would likely be absent from work as a

result of her impairments or treatment about two days a month. (Tr. 430). Dr. Miller also

indicated that plaintiff's experience of pain or other symptoms would frequently interfere with

attention and concentration needed to perform even simple work tasks. (Tr. 428).

The ALJ summarized Dr. Miller's opinions and stated that the "residual functional

capacity used in this decision is for sitting work and adheres mostly to the limitations expressed by

Dr. Miller." (Tr. 72). Later in his opinion, the ALJ noted that Dr. Miller has specifically treated

plaintiff's orthopedic impairments and, as such, "is more familiar with the general symptoms

caused by the impairments the claimant has." (Tr. 73). The ALJ also stated that Dr. Miller's

opinion that plaintiff's pain would cause some adverse concentration and attention limitations-

rather than Dr. Cabral's opinion that plaintiff's pain would constantly interfere with plaintiff's

attention and concentration-was supported by the record. (Id.).

"A treating physician's opinion should not ordinarily be disregarded and is entitled to

substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). See also SSR 96-2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."). However, "[w]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Halverson v. Astrue, 600 F.3d 922, 929-30 (8th Cir. 2010) (internal quotation marks omitted).

"'When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so.'" Martise v. Astrue, 641 F.3d 909, 925 (8th Cir. 2011) (quoting Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007)). When an opinion is not given controlling weight as the opinion of a treating source, the weight given to the opinion depends on a number of factors, including whether the source has examined the claimant, the nature and extent of the treatment relationship, the relevant evidence provided in support of the opinion, the consistency of the opinion with the record as a whole, whether the opinion is related to the source's area of specialty, and other factors. 20 C.F.R. §§ 404.1527(c).

Dr. Miller, an orthopedist, had been treating plaintiff for her knee impairments since July 2008. Dr. Miller performed surgery on plaintiff's left knee, and saw her for follow-up at least monthly until August 2009. (Tr. 427). Dr. Miller's opinions regarding plaintiff's limitations resulting from her knee impairments were entitled to substantial weight provided they were supported by the record. In support of his opinions, Dr. Miller noted symptoms of knee pain, swelling, antalgic gait, inability to stand or walk or prolonged periods. (Id.). Dr. Miller also listed the following objective signs: x-rays revealing medial joint space narrowing with osteophyte

formation, knee effusion, and limited range of motion. (Id.). These objective signs noted by Dr. Miller are reflected in Dr. Miller's treatment notes. Thus, Dr. Miller's opinions are supported by his own records.

Dr. Miller's opinions are also consistent with the other medical opinion evidence. Dr. Cabral, plaintiff's treating primary care physician, completed a Physical Residual Functional Capacity Questionnaire on October 23, 2010, in which he expressed the opinion that plaintiff was unable to work due to difficulty in mobility and moving objects. (Tr. 410). Dr. Cabral found the following limitations: plaintiff's experience of pain would interfere with attention and concentration needed to perform even simple work tasks constantly; she was incapable of even "low stress" jobs; she could sit or stand for ten minutes at one time; sit or stand a total of two hours in an eight-hour work day; must use a cane and brace when standing or walking; can rarely lift less than ten pounds and can never lift more than ten pounds; can rarely twist or climb stairs; and can never stoop, crouch, or climb ladders. (Tr. 413). On October 25, 2010, Dr. Nasarallah, plaintiff's chiropractor, completed a Physical Medical Source Statement, in which he expressed the opinion that plaintiff was capable of sitting for a total of one hour, standing a total of thirty minutes, walking a total of fifteen minutes, lifting and carrying five pounds occasionally, had a significant manipulative limitation of the ability to handle with both hands, was limited in her ability to balance, could never reach or stoop, could never be exposed to odors or dust, could occasionally be exposed to noise, should use a cane and brace, should lie down during a normal workday, and would need to take a break every ten to fifteen minutes. (Tr. 423-26). Finally, consultative orthopedist Dr. Morris examined plaintiff in November 2010, and expressed the opinion that plaintiff could occasionally and frequently lift or carry less than ten pounds; stand or

walk less than two hours in an eight-hour workday and that a medically required hand-held assistive device is necessary for ambulation; must periodically alternate between sitting and standing to relieve pain; her ability to push and pull is limited; and can never climb, balance, kneel, crouch, crawl, or stoop. (Tr. 437-38).

The undersigned finds that the ALJ erred in rejecting some of the limitations found by Dr. Miller. Specifically, Dr. Miller found that plaintiff's ability to stand and walk was limited to less than two hours in an eight-hour workday; plaintiff can rarely stoop and climb stairs; plaintiff would be required to walk every sixty minutes for five minute periods; plaintiff would need to take unscheduled breaks to rest one to two times during a workday for periods of ten minutes; plaintiff would likely be absent from work as a result of her impairments or treatment about two days a month; and plaintiff's pain or other symptoms would frequently interfere with attention and concentration needed to perform even simple work tasks. (Tr. 428). Dr. Miller cited objective findings in support of his opinions, and all of the other physicians who expressed opinions regarding plaintiff's limitations found similar limitations. The ALJ acknowledged that Dr. Miller was most qualified to express an opinion regarding the limitations caused by plaintiff's orthopedic impairments. (Tr. 73). The ALJ, however, provided no explanation for his decision to exclude some of the limitations found by Dr. Miller. Instead, the ALJ simply stated that the RFC he formulated "adheres mostly" to the limitations found by Dr. Miller. (Tr. 72). Notably, despite finding that Dr. Miller's opinion that plaintiff's pain would result in concentration and attention limitations, the ALJ included no such limitations in his RFC.

Further, it is significant that the limitations found by Dr. Miller were only with regard to plaintiff's knee impairments. The ALJ also found that plaintiff's obesity and lumbar degenerative

disc disease with facet osteoarthritis were severe impairments. (Tr. 68). Consultative orthopedist Dr. Morris considered plaintiff's knee impairments as well as her back impairment. (Tr. 434). Dr. Morris noted the following findings on examination: plaintiff was able to walk fifty feet slowly, stopping after twenty-five feet; used a cane in her right hand; walked bent forward thirty degrees at her spine and stood thirty degrees forward flexed; cannot heel walk, toe walk or do a tandem gait nor squat; cannot dress nor undress independently; can rise from a chair by using a cane in the right hand and pushing up with her left; and cannot get on or off the examining table; global tenderness to light touch of the right knee; and the left knee lacked thirty degrees of extension, and flexed to sixty degrees with global tenderness. (Id.). As previously noted, Dr. Morris found limitations similar to those of Dr. Miller, with the following additional limitations: plaintiff could lift and carry frequently and occasionally less than ten pounds; she must alternate between sitting and standing to relieve pain; plaintiff is limited in her ability to push and pull in her upper and lower extremities; and she should never climb, balance, kneel, crawl or stoop. (Tr. 437-38). The ALJ provided no explanation for his failure to adopt all of the limitations by Dr. Morris.

## Conclusion

In sum, the undersigned finds that the ALJ erred in determining plaintiff's residual functional capacity. Specifically, the ALJ failed to provide good reasons for rejecting some of the limitations found by plaintiff's treating orthopedist, Dr. Miller, regarding plaintiff's knee impairments. The ALJ also failed to adequately consider the effect of plaintiff's back impairment and obesity on plaintiff's residual functional capacity. Every physician who expressed an opinion regarding plaintiff's work-related limitations, including the consulting orthopedist, found greater limitations than those found by the ALJ. The hypothetical question posed to the vocational expert

was based on this erroneous residual functional capacity. Consequently, this cause will be reversed and remanded to the ALJ in order for the ALJ to properly weigh the medical opinion evidence, consider all of plaintiff's impairments, reassess plaintiff's residual functional capacity based on the medical evidence of record; and obtain vocational expert testimony to determine whether plaintiff is capable of performing work existing in significant numbers in the national economy with her residual functional capacity. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this  9th  day of September, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE